Shipp *v.* State.

Dec. 1, 1952

No. 38520      10 Adv. S. 34      61 So. 2d 329

542

*Berger & Callon, Trully & Trully* and *Corban & Corban,* for appellant.

*Dugas Shands,* Assistant Attorney General, for appellee.

LEE, J.

Russell Shipp was convicted of the larceny of a calf and was sentenced to serve a term of five years in the state penitentiary. From the judgment entered he appealed.

A number of errors are assigned, but we notice only the following: (1) the refusal of the court to inquire into and determine the sanity of the appellant preliminarily before the trial on the merits; (2) the admission of certain evidence; (3) the allowance of an amendment to the indictment; and (4) the refusal of the court to sustain the motion of the District Attorney to allow a nolle prosequi.

The calf was stolen about January 6, 1951. Shipp was reared in Calhoun County, but owned a place in Jefferson County. As a result of an extended investigation, he was arrested some days later, and gave bond for his appearance to await the action of the next grand jury. On January 18, an application was filed in the chancery court of Calhoun County to have him adjudged insane. The writ therefor was issued, together with notice to two physicians, who made their report, certifying that, in their opinion, Shipp was suffering from a mental or nervous disorder and was in need of treatment, etc., at a mental institution. On the same date, the court issued its order, committing him to Whitfield, and he was forthwith delivered to the institution. On February 2, he was taken before the full staff, consisting of 11 doctors, three externes and one psychiatrist. Many questions were asked and answers returned, all of which appear in the record. At the conclusion, eight of the doctors stated affirmatively in the record that the patient was suffering with schizophrenia, catatonic type. Elsewhere in the record it was shown that all of the staff actually concurred in that diagnosis.

The indictment was returned on February 5, and two days thereafter, a motion for a continuance was made on the ground that Shipp was then insane, and that he

was a patient and inmate of the institution at Whitfield. On the same date, the State sought the appointment of, and the court appointed, Dr. Willard L. Waldron, a pyschiatrist, to make an independent examination. Thereafter Dr. Waldron made his report and concurred in the findings of the Whitfield staff. The District Attorney attached this report, together with the certificate of Dr. F. A. Latham, of the Whitfield staff, which showed that all of the fourteen doctors agreed on the diagnosis of schizophrenia, catatonic type, to his motion in which he asked the Court for permission to enter a nolle prosequi. The motion was overruled, and the case was continued for the term.

At the September 1951 term of the court, a certificate from Dr. W. L. Jacquith, Superintendent of Whitfield, showing that Shipp was a patient of the institution and suffering with the same ailment, was filed, and the case was again continued.

At the February 1952 term, the court overruled a motion by appellant's counsel to dismiss or abate the prosecution on account of Shipp's insanity. Counsel then made a motion for a trial preliminarily as to the present insanity of the defendant on the contention that he was then incapable of making a defense. All of the foregoing facts were before the court on this motion, together with the entire record at Whitfield. The history of the case showed Shipp's three years in the Armed Forces, his subsequent graduation from Mississippi State College, and a recapitulation of his various acts and unusual conduct for about a year previous to the alleged larceny. Suffice it to say, every doctor and expert who had observed or examined him—a total of 17, most of whom were in the employ of the State—was of the opinion that he was insane. It is impossible to conceive how stronger proof of insanity could have been produced. In the face of this overwhelming proof, the court overruled the motion and entered an order which stated that the "Court having observed the defendant in the Court room and

his demeanor during the hearing finds that there is no good reason for a preliminary hearing to be held before the trial in this case on the issues involved including sanity,'' and directed the defendant to be brought to trial on the three issues of present insanity, insanity at the time of the commission of the offense, and as to guilt or innocence.

In American and English jurisprudence no͞ human being may be tried or punished for crime while he is insane. The opinion in the case of Hawie v. State, 121 Miss. 197, 83 So. 158, collated numerous authorities and quoted with approval certain excerpts therefrom. Some of those quotations are as follows: ''If a man in his sound memory commits a capital offense, and, before arraignment for it, he becomes mad, he ought not to be arraigned for it, because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried; for how can he make his defense? If after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced, and if, after judgment, he becomes of nonsane memory, execution shall be stayed; for, peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution.'' Cooley on Blackstone, Vol. IV, p. 24. . . . ''The true reason why an insane person should not be tried is that he is disabled by an act of God to make a just defense if he have one. As is said in 4 Harg. Stat. Tr. 205, 'There may be circumstances lying in his private knowledge, which would prove his innocency, of which he can have no advantage, because not known to the persons who shall take upon them his defense.' The most distinguished writers on criminal jurisprudence concur in these humane views, and all agree that no person, in a state of insanity, should ever be put upon his trial for an alleged crime, or be made to suffer the judgment of the law. A madman cannot make a rational de-

fense, and as to punishment, *furiosus solo furore punitur.*
. . . the humanity of the law of England had pre-
scribed that no man should be called upon to make his
defense, at a time when his mind was in such a situa-
tion that he appeared incapable of doing so; that how-
ever guilty he might be, the trial must be postponed to
a time when, by collecting together his intellects, and
having them entire, he should be able so to model his
defense, if he had one, as to ward off the punishment of
the law; and it was for the jury to determine whether
the prisoner was then in that state of mind. Shelf. 468.'
Freeman v. People, 4 Denio (N. Y.) 9, 47 Am. Dec. 216.
. . . 'The evidence strongly indicated, perhaps was
conclusive, of the prisoner's insanity at the time of the
trial. Under such circumstances, it was not proper that
he should have been put upon his trial. By the humanity
of the common law, a party who was insane at the time
of the trial could not be arraigned. If he became insane
after his conviction, he could not be executed while he
remained thus demented.' Jones v. State, 13 Ala. 153.
. . . 'If an indicted person is not sane, the court can-
not go on with the case; or if he becomes insane after
the trial commences, he can neither be sentenced, or, if
sentenced, punished, while his insanity continues.' Bish-
op's New Criminal Law, vol. 1, par. 396.''

So the Court said that ''if the defendant in this case
was insane, the court was in error in placing him upon
trial and in pronouncing the judgment of conviction.''
And since the petition alleged that Hawie was insane at
the time of trial and the demurrer admitted the truth-
fulness of the allegation, the Court reversed the con-
viction.

On the return of the case to this Court, reported as
Hawie v. State, 125 Miss. 589, 88 So. 167, it appeared
that a trial was had before a jury as to Hawie's sanity
at the time of his first trial, and the jury found that he
was insane. At the next term, the court declined to in-
quire again into his sanity, but proceeded to a trial on

the merits. This Court held that, before trying Hawie again, his mental status should have been inquired into, and it should have been determined that he was then sane, otherwise he could not be tried as to his guilt or innocence. The opinion cited with approval 10 Enc. P. & P. 1218, as follows: **(Hn 1)** ''It is a rule of universal application, and founded on the broad principles of humanity, that no insane person shall be tried, sentenced to any punishment, or punished for any crime or offense, while he continues in that state.''

**(Hn 2)** If the showing before the trial judge is sufficient to engender a reasonable probability that the defendant is then insane, that issue must be preliminarily submitted to a jury. ''But if there be any doubt whether the party be compos or not this shall be tried by a jury. Wendell's Blackstone's Commentaries, vol. 4, p. 25.'' First Hawie case, supra.

In Williams v. State, 205 Miss. 515, 39 So. 2d 3, it was said: ''The trial of a defendant, when his mind is so clouded that he cannot remember and intelligently relate what occurred at the time of the commission of the alleged offense, is a denial of due process and contrary to public policy, and when it appears to the trial court that there is a probability that defendant is incapable of making a rational defense, the trial should not proceed until defendant's mental condition has been investigated and it appears he is sufficiently rational to make defense. Carter v. State, 198 Miss. 523, 21 So. 2d 404; Hawie v. State, 121 Miss. 197, 83 So. 158, 10 A. L. R. 205. We urge upon the trial courts to observe this constitutional right of defendants, with meticulous care, and submit to the jury, preliminarily, the issue of the defendant's sanity in all cases where there is a probability that defendant is incapable of making a rational defense.'' At a former trial, it is true, Williams, on a suggestion of present insanity, was tried on that issue alone, adjudged insane, and committed to Whitfield. However, a re-examination of that record discloses that, on the

first trial, he was shown to be suffering with acute alcoholism. The evidence for the defendant came from a local doctor and lay evidence, and the State offered only lay testimony. However, when he was examined by the staff at Whitfield, no psychosis whatever was found, and the whole staff were of the opinion that he was not then insane, and had not been insane, and, after only about 30 days, he was discharged from the institution. Besides, the Superintendent of Whitfield testified that he had talked with Williams before the trial, and that he was sane. It must be assumed that the trial judge was fully apprised of Williams' condition when he dictated into the record that he had observed the accused in the courtroom, and that there was "no good reason, legal or otherwise, for a preliminary hearing to be had as to sanity or insanity of this man before the trial of this case on all issues."

In Davis v. State, 151 Miss. 883, 119 So. 805, the suggestion of insanity was signed, but not sworn to, by his counsel. Moreover, he did not present an affidavit or offer witnesses to prove his present insanity or inability to conduct a rational defense. This Court held that the mere motion alone was not sufficient to require the court to halt the trial and conduct a preliminary.

See also Luther Musselwhite v. State, No. 38,051, decided by this Court November 10, 1952, 7 Adv. S. p. 15.

(Hn 3) The trial court's refusal to try the issue of insanity preliminarily was reversible error.

(Hn 4) Certain evidence of the officers wherein they testified to the results of their investigations and as to what other people told them and pointed out to them in the course of their investigations was objected to, but the objections were overruled. This evidence was hearsay and inadmissible. It was prejudicial and damaging, and its admission is a sufficient ground alone to award a new trial, even if the court had not committed reversible error in refusing to try the issue of insanity preliminarily.

**(Hn 5)** As to the amendment of the indictment by the addition of ''red'' in the description of the calf, such amendment is expressly authorized by Section 2532, Code 1942. See also annotations thereunder.

**(Hn 6)** There was no error in the refusal of the court to grant the motion of the District Attorney for a nolle prosse. See Section 2566, Code 1942, which is in part as follows: ''Prosecutions not compromised or nol prossed without consent of court, or dismissed, except at defendant's cost.—A district attorney shall not compromise any cause or enter a nolle prossequi, either before or after indictment found, without the consent of the court; . . .''

Reversed and remanded.

*Roberds, P. J.,* and *Hall, Holmes* and *Arrington, JJ.,* concur.