608 So.2d 304 (1992)
Clarence Earl ADDKISON
v.
STATE of Mississippi.
No. 89-KA 26.
Supreme Court of Mississippi.
August 5, 1992.
Michael H. Steele, Steele & Shaw, Kosciusko, for appellant.
Michael C. Moore, Atty. Gen., Deirdre McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
BANKS, Justice, for the Court:
In this appeal, the Court is asked to revisit the procedure to be followed when the competency of the accused to stand trial is in issue. We find that the defendant did not receive a proper hearing on this issue, and that it is likely that an erroneous legal standard was employed. We therefore reverse the conviction and remand this matter for further proceedings.

I
The proceedings below began when the grand jury returned a two-count indictment against Clarence Earl Addkison (Addkison) in March of 1987; The indictment charged *305 that on August 15, 1987, Addkison "burglariously [broke] and enter[ed] into the occupied dwelling house ... of ... [and], based on the same transaction and on a series of acts connected together and constituting parts of a common scheme, ... did unlawfully, feloniously, purposefully and knowingly cause bodily injury to Lydia Doude... ."
The defense began its case by filing a "Motion for Psychiatric Examination of Defendant." The motion alleged as grounds, "Addkison's inability to cooperate with his attorney in formulating a defense to the charges against him; his patent speech defect; his past incarceration in institutions for the retarded or mentally defective... ." The court granted the motion on September 23, 1987. After examination, defense counsel filed a motion requesting a hearing seeking commitment of Addkison for treatment in the State Hospital based on the findings of Dr. Robert McKinley, who found the defendant unable to stand trial due to incompetence. On March 11, 1988, the court granted the motion and found that Addkison was incompetent to stand trial. It ordered that Addkison undergo further psychiatric examination and or treatment at the State Hospital to determine and ascertain sanity and competence.
On June 24, 1988, a letter was received from the mental health staff at the State Hospital, who examined Addkison and reviewed his case. It stated that it was the unanimous opinion of the staff that Addkison was competent to stand trial and knew the difference between right and wrong at the time of the commission of the crimes.
Addkison gave written notice to the prosecutor that the defense of insanity would be offered. On September 9, 1988, he filed a motion requesting (1) a preliminary jury trial on the question of whether or not Addkison was competent to stand trial and (2) a re-examination of the defendant by Dr. McKinley. The circuit court, on September 16, 1988, scheduled a hearing for September 20 to "allow the testimony of Dr. Robert McKinley to be introduced into evidence regarding the mental status of" Addkison.
By order dated September 16, 1988, the circuit court overruled Addkison's motion for a jury trial or competency hearing prior to trial. Trial ensued. The jury returned a guilty verdict as to Count I, burglary of occupied dwelling house. As to Count II, the aggravated assault charge, the jury could not reach a unanimous verdict.
A judgment was entered sentencing Addkison to serve twelve years in the Mississippi Department of Corrections pursuant to conviction as to Count I. After post conviction motions were denied appeal was timely perfected to this Court on October 20, 1988.

II
In support of his first motion for a psychiatric exam, Addkison called Dixie Deason, (Deason), Addkison's sister, to testify. Her testimony established that the defendant was her natural brother and at the time of the hearing was twenty-four years old. Of his twenty-four years, Addkison and Deason had only lived together approximately one year, 1986. Deason and Addkison were separated when she was eight and he, six. Deason explained that the family unit was severed "[b]ecause Mama and Daddy stayed drunk and they'd fight and fuss, and the Welfare took us away from them." She and her brother were sent to a number of different foster homes. She was in Philadelphia, Mississippi, and Addkison was sent to Macon, Mississippi, then to the Ellisville Training School. She stated that her brother cannot read and can only write his name and "when he is looking at his name, he can spell it." Deason testified that Addkison did not complete any grade in school. After leaving Ellisville, he was sent to Jackson to the Hudspeth Retardation Center, where he spent approximately three years. Upon leaving Jackson, he was sent to an institution in Greenville for nine to ten months.
Deason testified that her brother was disabled and received a social security check. The checks were made payable to Deason because Addkison was unable to handle money. She stated that she had occasion to observe her brother during the *306 previous year and in her estimation, he had been acting "funny" since coming to live with her. By "funny" she meant that
he could just be sitting on the couch, you know, and something come to his mind and he jumps up and takes off and he won't tell us where he's going or nothing, and he's liable to be gone all day and he might come back, you know, and then he might not. And then he could be sitting there and the kids be setting in the floor and he'd start hollering at them, and then I'd say something to him and he don't remember saying nothing to the kids.
Deason stated that this behavior or those spells occurred frequently, two-to-three times a week. She also testified that Addkison had a speech impediment, making it difficult for others to understand what he says. Her brother is also argumentative and has never had regular employment or held any jobs in his lifetime. Deason stated that her brother does not understand what is going on around him and has a problem relating things in time, as evidenced by his inability to tell one year from the next.
On cross-examination, Deason explained that Addkison's erratic behavior would occur sometimes during the night. Such behavior occurred on the night he allegedly committed the crimes in the instant case. She testified that he suffered from blackout spells two-to-three times a week. At the conclusion of the spells, he returns to his usual self. She testified that she had seen him drink, but she had never seen him drunk. Also, he was non-responsive when she asked him why "he was doing this." She was unaware of Addkison's whereabouts for the ten years before he came to live with her.
On re-direct, Deason testified that Addkison has never had a driver's license, and though registered to vote, never had. He does not own anything, other than his clothes. She considers her brother abnormal and afflicted.
After Deason was excused, the Court ordered that defense counsel schedule an appointment for Addkison at the Region VI Mental Health Services, to be examined by a psychiatrist who was "to determine whether or not Addkison was competent within the McNaughton [sic] Rule," stating that "[t]he test for competency to stand trial in this state is the NcNaughton [sic] Rule."
On March 11, 1988, the court reviewed the reports of Dr. McKinley and Dr. Richard Sayer, court-appointed psychiatrist and clinical psychologist, respectively, and entered an order committing the defendant to the State Hospital at Whitfield for further treatment and evaluation.
After the state hospital staff reported Addkison competent to stand trial, defense counsel sought a hearing to contest that finding before a jury impaneled for that purpose. On September 12, 1988, a hearing was held on the motion for a separate trial of the competency issue. Defense counsel there testified as to Addkison's present ability to assist in his defense.
Counsel stated that Addkison was unable to aid counsel in any way. Specifically, he stated that the defendant could not provide any material assistance to make a rational defense to the charges lodged against him. Deason was called to testify at this hearing. She stated that her brother "just don't know, you know, anything." She testified that he did not understand any of the ramifications of the proceedings.
In response to the court's question concerning whether or not Addkison had given counsel his version of the offense, counsel stated that Addkison's version was illogical and incomprehensible. Counsel testified that defendant, when questioned about the matter, basically repeated what he had been told by the police and the people at Whitfield.
The court entertained argument. The state acknowledged that the determination of sanity or insanity was a jury question. The state succinctly phrased the issue as who must determine competency  a jury or judge or either.
The court decided that it had followed the provisions of Rule 4.08. Specifically it found

*307 that the evidence does not go to showing a probability the Defendant is incapable of making a rational defense, though it might show a possibility, and the motion is overruled.
On September 19, 1988, another hearing was held at which defense counsel renewed the "Motion for Separate Jury Trial on the Issue of Competency." The court again, overruled the motion and the hearing was concluded.
On September 20, 1988, after refusing a full hearing and determining that Addkison was competent to stand trial, the court held a hearing on the "Motion to Suppress" at which the issue was whether Addkison's mental condition rendered his statements involuntary and inadmissible. Dr. Helen C. Robertson, clinical psychologist at the Mississippi State Hospital at Whitfield testified and gave some insight into the staff determination of competence to stand trial.
She stated that she first saw Addkison on April 7, 1988. Addkison remained at the hospital through June 22, 1988, approximately two and one-half months. Dr. Robertson explained that she and the other doctors were asked to give opinions as to the defendant's mental state at the time of the commission of the crimes. In order to answer those questions, the staff interviewed Addkison repeatedly, received background information from his family, and observed him twenty-four hours per day. After administering a battery of psychological tests, the staff at Whitfield determined that Addkison was mildly retarded. Scoring between 50 or 55 to 69 or 70 marked the range of someone mildly retarded. Addkison's full scale IQ was 60, verbal IQ was 61 and performance, 63.
Dr. Robertson stated that she saw Addkison seven times, totaling more than three and one half hours. She explained that in determining competency, she asked the patient about the crime(s) he allegedly committed, possible penalty, name of his attorney, about the assistance he could provide his attorney, and whether or not he understood the functions of the various people in the courtroom. She also ascertained whether or not the patient knew the consequences of being convicted and what behavior was expected in the courtroom.
Dr. Robertson testified that Addkison knew the charges against him and the possible sentence he could receive under each charge. She stated that from the beginning, Addkison knew his attorney and could give his version of the crime. He was able to relate his version of the crime in a consistent manner. His version at the time of admission was not different at the time of discharge. The last time she interviewed him was the day before he was discharged. She stated that the defendant knew some of his rights and remembered why they were read to him. In her opinion, Addkison could cognitively understand his rights as related to him by a lawyer or remain silent if someone told him about such rights. She did not think he was competent to stand trial on April 7, 1988, but by June 21, 1988, he was competent to stand trial. Dr. Robertson testified that "[t]here was no issue that he was mentally ill. You know, we admitted him because he did not seem to know just those basic things." He was not psychotic or in need of psychiatric treatment, instead, he was diagnosed as an abuser of alcohol, suffering from mild mental retardation and antisocial personality disorder, and speech impediment. She and the other staff members assigned to Addkison believed that Addkison knew the difference between right and wrong at the time of the crimes that allegedly occurred.
Dr. Robertson's testimony on cross-examination revealed that Addkison had a degree of mental inferiority from birth making him unable to care for himself in normal terms. She testified that he was unable to manage his affairs. She could not say with any certainty whether or not Addkison understood specifically his Miranda rights at the time he was questioned.
Dr. Margie Lancaster testified that she was a staff neurologist and director of the forensic unit at Whitfield. She examined Addkison for the first time in 1973 when he was ten years old. She saw him again on April 7, 1988, when he was admitted for competency testing. She opined that he *308 was competent to stand trial and thought that he knew the difference between right and wrong at the time the crime was committed. She testified that under M'Naughten, Addkison was sane. She diagnosed him as being mildly mentally retarded. The doctor was of the opinion that he had the cognitive ability to understand his rights.
Dr. Barry Amyx, a psychiatrist at the University Medical Center, was called by Addkison. He classified Addkison as a "high end imbecile[1]." In short, he believed the defendant to be feeble-minded and not able to understand right from wrong. He stated that Addkison did not have the mental capacity to understand his Miranda rights in August of 1987. When asked a question designed to elicit an opinion regarding Addkison's ability to stand trial, Amyx gave an answer that was unresponsive. That line of inquiry was not pursued.
Dr. Amyx testified on cross-examination that he only spent one-half hour interviewing Addkison. He admitted that Addkison could understand the Miranda warnings, if they were worded properly. He thought Addkison was insane under M'Naughten.
At the conclusion of the testimony, the court repeated its ruling that Addkison was "competent to stand trial under [M'Naughten]" and determined that the confession was voluntary and Addkison had the capacity to understand what he was doing. Thus, the motion to suppress was overruled.
Trial ensued at the beginning of which, defense counsel renewed, inter alia, his motion for a separate jury trial on the issue of competency. The court overruled the motion. The witnesses testifying at the suppression hearing also testified at the trial, and their testimony remained unchanged.
During its case, the defense elicited testimony from witnesses, primarily relatives of Addkison, which went to the defendant's mental capacity. The cumulative testimony of the defense witnesses was that Addkison had been slow and retarded from birth. Additionally, most of the witnesses did not think that Addkison was normal, but thought that he was insane. The jury returned a verdict of guilty as charged to burglary of a dwelling.

III
Addkison contends that he should have been granted a separate trial on the issue of feeble-mindedness. In the alternative, he argues that the jury should have been allowed to consider the issue of feeblemindedness in the case-in-chief.
The state responds that the failure of the court to impanel a jury to determine Addkison's competency prior to trial on the merits was not error. It contends that the court properly concluded that there was no probability that Addkison was unable to assist in his defense.
Rule 4.08 of the Uniform Criminal Rules of Circuit Court Practice in conjunction with Miss. Code Ann. § 99-13-11 (1972) governs the issue before the Court. The rule provides in parts relevant to the present discussion:
(1) Inability to Stand Trial. If before or during trial the court, of its own motion or upon motion of counsel, has reasonable ground to believe that the defendant is insane, the court shall order the defendant to submit to a mental examination by some competent psychiatrist selected by the court in accordance with Miss. Code Ann. § 99-13-11 (1972).
* * * * * *
If the examination determines that the defendant is insane the court shall commit him or her to the state asylum for *309 the insane. The order of commitment shall require that the defendant be examined and a written report be furnished to the court at that time and every following four months... .
* * * * * *
If at any time during such commitment the proper official at the state asylum for the insane shall consider that the defendant is mentally competent to stand trial, such official shall promptly notify the court of that effect in writing, and place the defendant in the custody of the sheriff. The court shall thereupon conduct a hearing on the mental competency of the defendant.

If at any time during such commitment, the court decides, after a hearing, that the defendant is mentally competent to stand trial, it shall enter its order so finding and declaring the defendant sane, after which the court shall proceed to trial.
Rule 4.08 Unif.R.Cir.Crt. Prac. (emphasis added)
The rule and the cases interpreting both rule and statute imbue the trial court with great discretion in determining the issue of competency to stand trial. In Emanuel v. State, 412 So.2d 1187 (Miss. 1982), this Court outlined the procedure to be followed when there is a question of the defendant's mental competency to stand trial. There the Court commented
[w]hen the competency of a defendant to stand trial is raised, the trial court should preliminarily, prior to trial, conduct a hearing to determine whether there is a probability that defendant is incapable of making a rational defense.
* * * * * *
After hearing all the evidence, the trial judge should weigh the evidence and make a finding as to whether there is a probability that defendant is incapable of making a rational defense. If the evidence shows such a probability, then the trial court should impanel a jury to decide that issue prior to trial on the merits.
If the trial court is of the opinion, after weighing the evidence both for the state and the defendant, that there is not sufficient proof to show a probability that defendant is incapable of conducting a rational defense, he should make such finding a matter of record. The case may then proceed to trial on the merits.
When the trial court has made a finding that the evidence does not show a probability that the defendant is incapable of making a rational defense, we will not overturn that finding unless we can say, from the evidence, that the finding was manifestly against the overwhelming weight of the evidence. The evidence must show more than a possibility that defendant is incompetent to stand trial  the evidence must go further until it appears to the trial court that there is a probability that defendant is incapable of making a rational defense. In this initial inquiry, the trial judge must weigh the evidence and be the trier of facts.
In the case at bar, the court refused to impanel a jury to decide the issue of competency, despite numerous requests from defense counsel. The court decided that it had followed the provisions of the rule. It stated that the evidence did not go to showing a probability that the defendant was unable to make a rational defense. It premised its holding on the reports from the staff at Whitfield and the report from Dr. McKinley.
At the time the court made its ruling, it did not have sufficient competent evidence on which to base the ruling. The only non-hearsay evidence before the court consisted of the testimony of defense counsel and defendant's sister, Deason. Defense counsel stated that the defendant had merely been placed in a training course at Whitfield and that he was in no better position to assist in his defense than he was prior to going to Whitfield. He stated that Addkison was unable to provide him with any material assistance to make a rational defense to the charges against him. Deason buttressed defense counsel's statements. She testified that her brother did not understand any of the proceedings *310 and he just did not understand what was happening to or around him.
Moreover, during his consideration of the issue of competency, the trial court repeatedly expressed the view that the test for competence is the M'Naughten Rule. While M'Naughten is the test for criminal responsibility for one's actions, it is not the standard to be applied where the issue is competence to stand trial. Caylor v. State, 437 So.2d 444, 447, n. 1 (Miss. 1983).
Briefly, the M'Naughten rule is the difference between right and wrong test in the trial of the case on its merits. Myrick v. State, 290 So.2d 259 (Miss. 1974); Hixon v. State, 165 So.2d 436 (Fla.App. 1964). The Dusky rule presents the question of whether or not a defendant has the present competency to stand trial and whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him. Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).
While the evidence adduced at the hearing on the motion to suppress would have provided substantial evidence on which to base a conclusion that Addkison was competent to stand trial, the conclusion had already been reached by that time and there was no indication that the question of competency to stand trial was an open one before the court at that time. Under the circumstances, counsel can be faulted little for failing to pursue the issue further with Dr. Amyx or other witnesses. Moreover, even at this stage, the trial court repeated the M'Naughten test in connection with competence to stand trial.
We hold that the evidence before the court on Addkison's motion for a preliminary determination of competence was a sufficient threshold showing entitling him to a full hearing. The trial court's failure to grant a full hearing appears to have been based, in part, on an erroneous view of the proper standard. Under the circumstances, fairness demands that we reverse the conviction and remand this matter to the trial court for proper proceedings, beginning with a competency hearing.

IV
The question remains whether a competency determination must be made by a jury. The majority of jurisdictions provide for competency inquiry by court only[2].
In Mississippi, the origins of jury competency determination emanate from English common law. In 1919, this Court observed that the state had no procedure in place which outlined what was to be done in cases where the court becomes aware of the defendant's insanity at the time of trial for a felony. In Howie v. State, 121 Miss. 197, 83 So. 158 (1919), the defendant was insane at the time of trial and conviction for murder. He was sentenced to death. On appeal, he assigned as error the trial court's order sustaining a demurrer to his petition for writ of error coram nobis. In his application for the writ, the defendant claimed that because of his mental incapacity, he was unable to assist in his defense. On appeal this Court cited with approval Wendell's Blackstone's Commentaries, vol. 4, pp. 24-25, where it was stated that *311 where there was doubt as to whether or not a person charged with a crime is compos, then the issue should be presented to a jury. Howie v. State, 83 So. at 159. Although, not specifically outlining a procedure or determining who was to make such competency inquiries, the Howie Court appeared to leave such decisions with the jury because it cited with approval not only Lord Blackstone, but a decision[3] from the Arkansas Supreme Court which left such questions to juries.
In Davis v. State, 151 Miss. 883, 119 So. 805, 806 (1929) the Court held that it was incumbent upon the defendant to present the lower court with an affidavit or witnesses proving present inability to conduct a rational defense; mere motion by defense counsel was insufficient to require the court to halt trial and conduct a preliminary hearing on competency. See also, Skinner v. State, 198 Miss. 505, 23 So.2d 501 (1945) (motion or suggestion of incompetency must be accompanied by affidavits or the offer of witnesses to prove insanity or inability to proceed).
In Dunaway v. State, 157 Miss. 615, 128 So. 770 (1930), the Court adhered to the rule announced in Hawie v. State, 125 Miss. 589, 596, 88 So. 167, 167 (1921), which held that
"[I]f at the arraignment of a defendant charged with the commission of a crime, it is suggested or appears to the court that he may be insane, the question of his sanity vel non should be inquired into and determined, and, if he should be found to be then insane, his trial should not be proceeded with unless and until he recovers his sanity."
In Keeton v. State, 175 Miss. 631, 167 So. 68 (1936), the Court stated that it was the duty of the lower court, when faced with competency questions, to inquire into and determine whether or not the defendant was fit to stand trial.
Shipp v. State, 215 Miss. 541, 61 So.2d 329 (1952), was the first case where the Court explicitly held that the question of competency must be submitted to a jury as a preliminary matter. In unequivocal terms, the Court urged that the lower tribunals "observe the constitutional rights of defendants, with meticulous care, and submit to the jury, preliminarily, the issue of the defendant's sanity in all cases where there is a probability that defendant is incapable of making a rational defense." Id. 61 So.2d at 331 (emphasis added). The trial court's refusal to try the issue preliminarily was reversible error.
In Williams v. State, 205 Miss. 515, 523, 39 So.2d 3 (1949), the accused assigned as error the lower court's refusal to submit to the jury, preliminarily, the question of his competence. On appeal, the Court held that it was not error for the lower court to submit to the jury the issue of sanity at the time of trial, the issue of sanity at the time of the commission of the offense, and the issue of guilt or innocence, all at the same time. Crucial to the Court's opinion were the facts of the case. Specifically, the Court noted that the trial judge observed that the defendant was capable of making a rational defense. In addition, the jury found that the accused was sane at the time of trial.
We can discern no rational basis for requiring a preliminary determination of competency to stand trial to be submitted to a jury. The practice may be both time consuming and costly. Our trial courts make many factual determinations unaided by a jury including, for example, those with regard to suppression of evidence and competency of witnesses. We hold that all determinations of competency made pursuant to Rule 4.08(1) may in the court's discretion, be made by the court sitting without a jury. The pre-rule procedure suggested by Shipp v. State, 215 Miss. 541, 61 So.2d 329 (1952) to the extent that it requires a jury is abandoned.

V
This matter is being remanded and it will possibly be retried. We therefore discuss other assigned errors capable of repetition in the interest of judicial economy.

*312 A.
Addkison contends that he was improperly denied a preliminary hearing prior to being indicted and the failure of the state to afford such a hearing prior to indictment resulted in loss of valuable rights including the right to cross-examine witnesses and offer evidence in his own behalf. Moreover, since a preliminary hearing pre-indictment was denied, then he, pursuant to Rule 4.09 of the Uniform Criminal Rules of Circuit Court Practice (Rule 4.09), was entitled to and should have received a transcription of the grand jury proceedings. The essence of Addkison's argument is that since he received no preliminary hearing prior to indictment, to deny him access to the testimony of the witnesses testifying before the grand jury would result in a denial of constitutional rights.
In Hansen v. State, 592 So.2d 114, 123 (Miss. 1991), the Court held,
[t]he preliminary hearing rule affords an accused no right of discovery, and we say this notwithstanding common knowledge that over the years accuseds have used preliminary hearings as occasions for discovery. (citations omitted) Hansen's right to discovery is controlled by Rule 4.06. It is at best a by-product of Rule 1.07.
See also, Pennsylvania v. Ritchie, 480 U.S. 39, 52, 107 S.Ct. 989, 998-99, 94 L.Ed.2d 40 (1987) (the right to confrontation of those testifying against a defendant, is a trial right, and this advantage is merely an incident to and not the basis of a preliminary hearing) Thus, since no right to discovery inheres with the grant of a preliminary hearing, Addkison was not prejudiced by the lack of hearing prior to indictment. It follows that Addkison also was not entitled to transcription of the grand jury proceedings as a remedy for not receiving a preliminary hearing prior to indictment.

B.
Addkison's claim of entitlement to the grand jury testimony of witnesses based on Rule 4.09 deserves consideration, however. Rule 4.09 provides that the court may hold an omnibus hearing upon request, or on its own motion. The rule outlines what is to take place at such a hearing and, in Appendix A, provides a checklist to be followed. Miss. Unf.Cr.Rules Cir.Ct.Rule 4.09 Appendix A. Among the subparts of Appendix A are 6(e), 6(f) and 6(g) which contemplate, respectively, a statement by the prosecution as to whether grand jury proceedings were recorded, a statement concerning whether or when the grand jury testimony of witnesses to be called by the state at a hearing or trial are to be supplied to the defendant and a setting for any hearing necessary to determine issues concerning the supplying of grand jury transcripts.
It is elemental that grand jury proceedings are cloaked with secrecy. Miss. Code Ann. §§ 97-9-53 (1972)[4] and 13-5-61 (Supp. 1991)[5], as well as Miss.Unif.Crim. R.Cir.Ct.Prac. 2.04[6] prohibit disclosure of *313 any actions of the grand jury within six months of the adjournment of the court for which they sat as grand jurors. The language of the statutes and rule is clear and prohibits disclosure of any action before the grand jury. See also, In re Knapp, 536 So.2d 1330, 1335 (Miss. 1988) ("We have read the statute carefully and cannot fathom that it allows Knapp to reveal what he said before the grand jury  at least, until expiration of the time limitation therein.")
These general rules of grand jury secrecy have no application, however, to testimony given by witnesses, who are to be used by the state at a pretrial hearing or at trial with respect to charges lodged by an indictment rendered and served as a result of such testimony. The period during which there is prohibition and a criminal sanction for disclosure of grand jury proceedings expires upon the arrest, admission to bail or recognizance of the accused. Miss. Code Ann. § 97-9-53 (1972): Miss. Unif.Cr.Rules of Cir.Ct.Rule 2.04. Both Rule 4.06(a)(1) and Rule 4.09 contemplate that grand jury testimony given by witnesses to be used by the state is available to the defendant in discovery. Since the trial of this case, Rule 4.06 has been amended to make clear that defendants are entitled to "any statement, written, recorded or otherwise preserved" and "the substance of any oral statement" given by any witness to be offered by the prosecution at trial. Rule 4.06(a)(1). This includes grand jury testimony.

C.
Addkison assigns as error the admission of the following testimony of Detective Robert Douglas of the Kosciusko Police Department.
Q. Now, you stated you also received from the Defendant after his arrest, in addition to the box of matches, a watch.
A. Yes, sir.
Q. Did you ever show that watch to Mrs. Doude?
A. Yes, sir, I did.
Q. What happened when you showed her the watch?
BY MR. STEELE: Now, your Honor, that would be hearsay and I'm going to object to it.
BY THE COURT: I believe he asked him what happened when he showed her the watch.
BY MR. STEELE: Well, Your Honor, I submit it's the same thing.
BY MR. SNYDER: (To the witness): Q. What did Mrs. Doude do when you showed her the watch?
A. She identified it as hers.

(V.IV at 98) (emphasis added)
Addkison contends that the admission of the detective's testimony permitted, in effect, the victim who was neither present nor testifying at trial, to testify to the identity of a crucial item of physical evidence linking him to the scene of the crime.
The state essentially concedes that the testimony was hearsay, but argues that this evidence was inconsequential in light of the overwhelming proof of Addkison's guilt. The testimony was obviously hearsay and we trust that the error will not recur on remand.

VI
For the reasons herein stated, Addkison's conviction is reversed and this matter is remanded to the circuit court for further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and McRAE, JJ., concur.
HAWKINS, P.J., concurs with separate written opinion, joined by ROY NOBLE LEE, C.J.
DAN M. LEE, P.J., concurs in result only.
HAWKINS, Presiding Justice, concurring:
The majority holds that the State is required to furnish the defense upon request the substance of unrecorded testimony of a witness before the grand jury. (Majority Opinion, p. 313) I have no choice but to *314 concur, for the majority holds precisely what Rule 4.06(a)(1) requires.
I write to point out its unfairness.
I do not know how many counties in Mississippi have a court reporter take down the testimony of witnesses appearing before the grand jury. My guess is very few. In virtually all counties witnesses appear before a grand jury of 15 to 20 citizens, usually with the district attorney or county attorney also present. The setting is somewhat informal, and the witness relates what he or she knows about the case.
The defense attorney knows the names and addresses of every witness who appears before the grand jury and is free to subpoena and question these witnesses himself. He can very easily fully inform himself of everything that witness knows about the case.
Yet, the State must do more. The district or county attorney, or both, must take notes of each witness's testimony and make sure it is accurate, and then furnish the defense with the "substance" of what the witness testified.
If it is incomplete or inaccurate, then some vital witness's trial testimony will be excluded because of a discovery violation.
This is an unfair burden to impose on the prosecuting attorneys. As I pointed out in the dissent when Rule 4.06(a)(1) was amended by this Court without the advice or consent of the circuit judges, Miss. Cases, So.2d Vol. 553-556, XLIX, no other jurisdiction makes such an absurd and unfair requirement of the prosecution.
ROY NOBLE LEE, C.J., joins this Opinion.
NOTES
[1] He explained that the term was dated and had been abandoned because it was similar to name-calling.

The classifications were normal  below normal was moron; below moron was imbecile, and the extremely impaired were called idiots. And so, you know, this is in common day language, pejorative, name calling and the like, so they were changed  the labels were changed in the opposite direction. Moron is what was called  moron became mild mental retardation. Of course, that's somewhat euphemistic ... Imbecile became moderate mental retardation ... All of them require impairment and adaptive functioning.
[2] Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Idaho, Iowa, Indiana, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Jersey, Ohio, Oregon, Pennsylvania, South Dakota, Utah, Washington, D.C., Wyoming, West Virginia.

The following jurisdictions do not specify who is to make the determination. However, a reading of the statutes and cases suggests that the inquiry will be conducted by judges. Montana, Wisconsin, Vermont.
Juries are required to make the determination in the following states: Alabama, Georgia, Missouri, Hawaii, Illinois, and Texas.
The remaining jurisdictions allow for court or jury determination: California, Kansas, Kentucky, New Mexico, North Carolina, Oklahoma  on demand jury may determine competency; Tennessee, Washington  initially judge makes determination; if defendant is found incompetent, she is committed. The second hearing can be before a jury upon demand by the defendant or her attorney, the prosecutor or judge.
[3] Adler v. State, 35 Ark. 517, 37 Am.Rep. 48 (1880).
[4] a grand juror, witness, district attorney, clerk, sheriff, or any other officer of the court, disclose the fact of an indictment being found or returned into court against a defendant, or disclose any action or proceeding had in relation thereto, before the finding of the indictment, or is six months thereafter, or until after the defendant shall have been arrested or given bail or recognizance to answer thereto, he shall be fined not more than two hundred dollars.
Miss. Code Ann. § 97-9-53 (1972).
[5] grand juror, except when called as a witness in court, shall not disclose any proceeding or action had by the grand jury in relation to offenses brought before it, within six (6) months after final adjournment of the grand jury upon which he served, nor shall any grand juror disclose the name or testimony of any witness who has been before the grand jury on pain of fine or imprisonment for contempt of court.
Miss. Code Ann. § 13-5-61 (Supp. 1991).
[6] Miss.Unif.R.Cir.Crt.Prac. 2.04 provides in relevant part,

[g]rand jurors, except when called as a witness in court, shall keep secret the proceedings and actions taken in reference to matters brought before it, for six months after adjournment of the court at which they were grand jurors, and the name and testimony of any witness appearing before the grand jury shall be kept secret... .
Id.