901 So.2d 1277 (2004)
Ishmael HARRIS a/k/a Chico a/k/a Ishamel Harris, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2003-KA-01186-COA.
Court of Appeals of Mississippi.
December 7, 2004.
Rehearing Denied February 22, 2005.
Certiorari Denied April 28, 2005.
*1278 Imhotep Alkebu-Lan, Raymond M. Baum, Winona, attorneys for appellant.
Office of the Attorney General by Billy L. Gore, attorney for appellee.
EN BANC.
KING, C.J., for the Court.
¶ 1. Ishamel Harris, A/K/A "Chico," was convicted of aggravated assault for having shot Paul Gayden and being a felon in possession of a firearm. As an habitual offender, Harris was sentenced to life imprisonment without the benefit of parole or probation, pursuant to Mississippi Code Annotated Section 99-19-83 (Rev.2000). He appeals asserting two issues which we quote verbatim:
1. Whether the trial court erred in unduly restricting defense counsel's cross examination of witnesses for the state thereby depriving the defendant of his right to confront witnesses against him pursuant to the Sixth Amendment to the United States Constitution and Article 3, Section 126 of the Mississippi Constitution?

*1279 2. Whether the trial court committed reversible error when it accepted the State's race-neutral reasons for excluding five blacks from the jury?

FACTS
¶ 2. Harris resided in North Carolina, where he had previously been convicted of burglary, assault with a dangerous weapon, shooting into an occupied property, escape from prison and voluntary manslaughter. He traveled to Mississippi to visit family members for the Labor Day weekend of 2002. During the evening hours of August 31, 2002, Harris and a friend, Peter Woodley, A/K/A "Otis Woodley," made three stops at Talley's Tobacco Shop in Vaiden, Mississippi. Sybil McChristian, who worked at Talley's, rang up his first purchase at approximately 4:30 p.m. Harris returned to Talley's at approximately 8:30 p.m., and made a second purchase. Paul Gayden, who was assisting McChristian, rang up Harris's second sale. At approximately 10:00 p.m., Harris returned a third time. He claimed to have left his wallet, which contained approximately $800, in the store. McChristian testified that Harris accused Gayden of having taken his wallet. McChristian informed Harris and Woodley that Gayden had walked across the street to a truck stop. Shortly thereafter, she heard gunshots.
¶ 3. Two sheriff's deputies parked near the truck stop, heard gunfire and drove to the truck stop. At the truck stop, they were told that a man had been shot by African-Americans in a white car. The deputies attempt to locate this car were unsuccessful. Deputy Benji Rigby returned to the truck stop, where he asked Gayden for a description of his assailants. Gayden identified his assailant as an African-American male wearing a white cap and white shirt. Gayden indicated that his assailant had confronted him about a missing wallet. When Gayden denied any knowledge of the wallet, the individual shot him. At trial, Gayden identified Harris as his assailant.
¶ 4. Two employees of the truck stop, Reneta Ward and Danny Donohoo, testified to having seen Harris shoot Gayden. Houston Green testified that he encountered Harris in a West, Mississippi nightclub later that evening, and Harris said he had shot someone earlier that night.

ANALYSIS

1. RIGHT TO CONFRONTATION AND CROSS-EXAMINATION
¶ 5. On several occasions prior to the trial, Gayden had told various persons that he did not know who shot him. In response to questions during his trial examination, Gayden acknowledged that during various private conversations with people in the community, he stated that he did not know his assailant's identity. No real explanation was given for these statements.
¶ 6. The defense called three witnesses, who testified that Gayden had said that he did not know the assailant's identity. Harris also attempted to examine Gayden on statements allegedly made to the grand jury disavowing any knowledge as to the identity of his assailant. However, when Harris attempted to examine Gayden concerning his testimony to the grand jury, the circuit court sustained the state's objection, as shown by the following:
Q: Now do you remember coming down to this courtroom, this courthouse sometime last year to testify before the grand jury?
A: Yes, sir.
Q: And you were sitting right out there in the hall out there?
A: Yes, sir.
Q: And there were other people sitting around there too, is that right?

*1280 A: Yes.
Q: And you were about to go into the grand jury room to testify?
A: Yes, sir.
Q: Do you remember saying before going into the grand jury room, "I really don't know who shot me?"
A: Yes, sir.
Q: And do you remember a white guy that was next to you said to you, Just say he shot him  excuse me; "Just say he shot you?"
A: No, sir.
Q: When you went inside, when you went inside the grand jury rom, did you tell them you didn't know who shot you?"
By Mr. Hill: Objection. He is asking about his grand jury testimony.
By the Court: Sustained.
¶ 7. Inconsistent grand jury testimony may appropriately be used for impeachment.
The period during which there is prohibition and a criminal sanction for disclosure of grand jury proceedings expires upon the arrest, admission to bail or recognizance of the accused. Miss.Code Ann. § 97-9-53 (1972): Miss. Unif. Cr. Rules of Cir. Ct. Rule 2.04. Both Rule 4.06(a)(1) and Rule 4.09 contemplate that grand jury testimony given by witnesses to be used by the state is available to the defendant in discovery. Since the trial of this case, Rule 4.06 has been amended to make clear that defendants are entitled to "any statement, written, recorded or otherwise preserved" and "the substance of any oral statement" given by any witness to be offered by the prosecution at trial. Rule 4.06(a)(1). This includes grand jury testimony.
Addkison v. State, 608 So.2d 304, 313 (Miss.1992).
¶ 8. However, this Court has nothing before it, which indicates what Gayden's testimony was before the grand jury. Therefore, we are unable to say that the grand jury testimony was inconsistent. However, it would appear that any error in the exclusion of this testimony was harmless error.
¶ 9. It is harmless error because Harris was able to place before the jury, through the testimony of Gayden and various other witnesses, the fact that Gayden had previously denied any knowledge as to the identity of his assailant.
¶ 10. The standard by which this Court determines whether an error is deemed harmless is well settled.
The basic test for harmless error in the federal constitutional realm goes back to Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The Chapman test is whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (quoted in Yates v. Evatt, 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991)). The Yates Court further clarified that the inquiry is not whether the jury considered the improper evidence or law at all, but rather, whether that error was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." Yates, 500 U.S. at 403, 111 S.Ct. 1884.

Williams v. State, 761 So.2d 149(¶ 18) (Miss.2000).
In addition to Gayden, there were two eye witnesses to the shooting, Ward and Donohoo, who both testified that they saw Harris shoot Gayden. Even if the testimony of Gayden were totally disregarded, the eye witness testimony of Ward and Donohoo still provided substantial evidence which supported the jury's verdict of guilty.
*1281 ¶ 11. Harris further contends that the circuit court "cut off" his cross-examination of Gayden and Donohoo as to whether they were told by law enforcement personnel "what to say." The trial court inquired of Harris whether he (1) had a basis for that claim and (2) whether he could identify the persons involved. Harris indicated that he had a basis, but could not identify the persons involved. The trial court informed Harris that when and if he could identify the persons involved, it would allow presentation of the evidence. Trial courts have discretion to control the presentation of evidence, and even prevent the admission of evidence that's probative value is outweighed by it's potential to confuse a jury. McGowen v. State, 859 So.2d 320 (¶ 34) (Miss.2003).
The trial court also stated, "You can also ask him [Gayden] if anybody asked him to testify as such. I'm not cutting you off on that. You just can't ask a question that insinuates somebody did that unless you can back that up? Are you following my ruling."
¶ 12. Harris also complains that the court unfairly curtailed his questioning of Ward as to why she did not come forward to give a statement until eight weeks after the shooting. The transcript contains six pages of cross-examination on why Ward did not come forward sooner. Harris then left this line of questioning to go into what Ward actually observed. Five pages later in the transcript, Harris returned to the issue of Ward's failure to come forward immediately. He inquired whether Ward personally knew the officer who ultimately took her statement and if she could have called him at his home. The circuit court found the question irrelevant. While a defendant is entitled to reasonable latitude to pursue a line of questions, that latitude does not extend to needless repetition, or question which are not relevant. Pate v. State, 838 So.2d 343(¶ 3) (Miss.Ct.App.2002). This issue is without merit.

2. BATSON ISSUE
¶ 13. The state exercised five out of six peremptory strikes to exclude African American jurors, after which Harris raised a Batson objection. The circuit court ruled that a prima facie case of discrimination had been established, and directed the state to provide race-neutral reasons for the peremptory strikes. The reasons offered by the State were (1) Juror 14 had never been gainfully employed and was not a student, and was believed to have concealed her knowledge of the defendant, (2) Juror 17 had grown up with the defendant, had a family member involved in a crime, and was believed to be mentally slow, (3)Juror 30 was unemployed and believed to be an alcoholic, and (4) Juror 24 responded to no questions. The circuit court accepted the State's reasons as race neutral. Upon appeal, Harris does not contend the circuit court erred in any procedural way, but contends that the race neutral reasons accepted by the court were "speculative or illusory."
¶ 14. The supreme court has stated a number of reasons a challenge may be seen as race-neutral.
"Included among those reasons: age, demeanor, marital status, single with children, prosecutor distrusted juror, educational background, employment history, criminal record, young and single, friend charged with crime, unemployed with no roots in community, posture and demeanor indicated juror was hostile to being in court, juror was late, short term employment."

Davis v. State, 660 So.2d 1228, 1242 (Miss.1995).
The reasons given by the State would appear to fall within the above noted group. Findings of fact concerning whether the *1282 stated reasons are race neutral are given great deference and will not be overturned unless clearly erroneous or against the overwhelming weight of the evidence. Tanner v. State, 764 So.2d 385, 393(¶ 14) (Miss.2000). Among the facts to be considered is the service of four African Americans on this jury. Under the facts of this case, we can not say that the trial court abused its discretion.
¶ 15. THE JUDGMENT OF THE CARROLL COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I AGGRAVATED ASSAULT AND COUNT II FELON IN POSSESSION OF A FIREARM AND SENTENCED AS AN HABITUAL OFFENDER TO LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT THE POSSIBILITY OF SUSPENSION, PAROLE OR PROBATION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO CARROLL COUNTY.
BRIDGES AND LEE, P.JJ., IRVING, MYERS, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.