655 So.2d 1 (1995)
James E. BILLIOT
v.
STATE of Mississippi.
No. 91-KA-00862-SCT.
Supreme Court of Mississippi.
February 16, 1995.
Rehearing Denied June 1, 1995.
*2 John C. Henegan, Butler Snow O'Mara Stevens & Cannada, L. Lee Tyner, Jr., Butler Snow Firm, Jackson, Bruce H. Hanley, Minneapolis, MN, for appellant.
Michael C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and SULLIVAN and SMITH, JJ.
SULLIVAN, Justice, for the Court:
James E. Billiot (Billiot) was convicted of capital murder and sentenced to death in the Circuit Court of Harrison County. The court entered judgment and sentence on December 2, 1982. His appeal of that conviction and sentence was unsuccessful. Billiot v. State, 454 So.2d 445 (1984). Billiot's Petition for Writ of Habeas Corpus filed in the United States District Court for the Southern District of Mississippi was held in abeyance pending Billiot's pursuit of all state remedies on the issue of his present insanity.
Billiot timely filed and this Court granted his Application for Leave to File a Motion for Post-Conviction Relief. Billiot v. State, 515 So.2d 1234 (Miss. 1987). This Court held that *3 Billiot was entitled to an evidentiary hearing to determine whether or not he is competent to be executed. In accordance with that decision, Billiot filed a Motion to Vacate, Set Aside, Suspend, or Correct Judgment and Sentence of Death on February 17, 1988.
The trial court held a competency hearing beginning November 14, 1988. The court denied Billiot's Motion, finding him competent to be executed pursuant to Miss. Code Ann. § 99-19-57(2)(b), and the United States Supreme Court decision, Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). The trial court denied his post-trial motions, and Billiot appealed to this Court. He presents the following issues for our review:
I. WHETHER BILLIOT IS ENTITLED TO DE NOVO REVIEW ON APPEAL OF THE DENIAL OF POST-CONVICTION RELIEF?
II. WHETHER THE EVIDENCE SUPPORTS THE FINDING THAT BILLIOT IS COMPETENT TO BE EXECUTED?
A. Whether the trial court made erroneous findings?
B. Whether the state's expert testimony was irrelevant and incompetent; the opinions were too remote in time, and whether they were based on interviews done while Billiot was under the influence of anti-psychotic drugs administered without his consent?
III. WHETHER THE EVIDENCE WAS EXAMINED UNDER INCORRECT LEGAL STANDARDS?
A. Whether the trial court erred in applying a legal presumption that Billiot is competent to be executed?
B. Whether Billiot presented sufficient evidence to shift the burden of proof to the state?
C. Whether the trial court's interpretation of § 99-19-57(2)(b) is constitutional error?
IV. WHETHER THE STATE VIOLATED BILLIOT'S RIGHTS TO DUE PROCESS OF LAW?
A. Whether the use of drugs without having first advised his hearing attorneys and without Billiot's consent violates his due process rights?
B. Whether use of the drugs impermissibly taints evidence relied on by the factfinder?
C. Whether the use of drugs impermissibly restricts the adversarial system essential to due process?
D. Whether the use of drugs undermines the integrity of the factfinding process because of its temporal and mercurial impact on Billiot?
E. Whether the state's procedure for determining Billiot's competence was inadequate in three ways?
V. WHETHER CHEMICALLY INDUCING SANITY TO EXECUTE BILLIOT CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT?
A. Whether treating Billiot with anti-psychotic drugs in preparation for his hearing is cruel and unusual punishment because it forces him to choose between insanity and death?
B. Whether chemically inducing sanity converts otherwise legitimate medical treatment into an element of the state's punishment?
C. Whether the act of chemically inducing sanity as a step towards executing an otherwise insane prisoner punishes Billiot more severely than others who are convicted of the same crime and receive the same sentence?
D. Whether chemically inducing competence to execute the Death Row insane places treating physicians in the position of executioner rather than healer?
E. Whether chemically inducing competence to execute insane capital offenders leads to the death of individuals who were traditionally not executed?
VI. WHETHER THE EXECUTION OF BILLIOT, WHO HAS BEEN REPEATEDLY DIAGNOSED AS A CHRONIC PARANOID SCHIZOPHRENIC, IS CRUEL AND UNUSUAL PUNISHMENT?
*4 VII. WHETHER MISS. CODE ANN. § 99-19-57(2)(a) CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT?

STATEMENT OF THE FACTS
The hearing to determine Billiot's competency to be executed was held on November 14 and 15, 1988. Billiot first called Dr. Donald Guild (Dr. Guild) as an adverse witness. Dr. Guild testified that he is a psychiatrist and was retained to examine Billiot in March, 1988, by Marvin White, assistant to the Attorney General. Dr. Guild examined Billiot on March 22, 1988, along with Dr. Charlton Stanley, a psychologist, approximately eight months prior to the competency hearing. Dr. Guild never made a definitive diagnosis, but stated that he did find that Billiot was not psychotic which would therefore exclude a finding of paranoid schizophrenia.
Dr. Guild found that Billiot, at the time of his examination on March 22, 1988, was in touch with reality  without psychosis, and stated that "[i]t means that he is not crazy now. It does not mean that he could not have been crazy in the past or in the future." He stated that Billiot was not a paranoid schizophrenic, but that he did meet the criteria for anti-social personality disorder. Dr. Guild determined that Billiot was competent to be executed. He testified as to certain criteria he relied on to make that determination:
One, does he know what he's facing? Does he know why he's seeing me? Does he know the purpose of the hearing? Can he communicate with his attorney effectively in the hearing, for whatever purpose it is? Does he know he's been convicted? Does he know what he's been convicted of? Does he have an understanding of his legal defense and recourses? Does he understand that he's gonna be executed and the finality of death? Does he understand the reason that he's being executed, the reason that he was sentenced? Does he have a comprehension of that? Does he have a comprehension of the facts or an ability to comprehend any facts that might save him, that might mitigate or change his status?
While Dr. Guild maintained that Billiot met the criteria for competency in March, 1988, he stated that competency is time dependent, and that "a man can be competent one time and then three months later, it's very possible that he will become incompetent."
Dr. Charlton S. Stanley (Dr. Stanley), who examined Billiot along with Dr. Guild on March 22, 1988, was also called by Billiot as an adverse witness. Like Dr. Guild, Dr. Stanley was contacted by the Attorney General's Office. Dr. Stanley is a psychologist, and has previously rendered opinions as to the competency of certain individuals to be executed: Connie Ray Evans, Jimmy Lee Gray and Earl Johnson. He stated that he found them to be competent to be executed.
Dr. Stanley relied on Billiot's prior history, his interview of Billiot conducted along with Dr. Guild, Ford v. Wainwright, and the relevant Mississippi statute, to make a finding as to Billiot's competency. In order to be competent to be executed, Dr. Stanley stated:
[Y]ou've got to be able to understand that you've been charged with a capital crime. That you are liable to execution. That you have to understand that a death sentence means that; that you are to be killed. And you are to understand the finality of that; that you can't have some sort of crazy idea that they can't kill you. You have to understand the purpose for which society deems your death necessary. That's paraphrasing, but I think that hits the  the major points. And if, because of some delusional or insane belief system that you can't meet those criteria, then you would not be competent to be executed. And  oh, yeah. You've got to be able  if you think of a mitigating ... circumstance at the last minute that you can communicate effectively with your attorney or someone. For an example would be to remember a witness at the last moment that ... says that you didn't do it. I think I hit them all.
The March 22, 1988 interview with Billiot was the only time Dr. Stanley examined him. He found Billiot competent to be executed. He agreed with Dr. Guild that competency is perishable.
Next, Billiot called Dr. Robert L. McKinley (Dr. McKinley) to testify. Dr. McKinley *5 is a psychiatrist who, among other things, worked as a consulting psychiatrist at Parchman in 1981, and again from 1985-88. While at Parchman, Dr. McKinley examined Billiot and diagnosed him as having chronic paranoid schizophrenic disorder. In his report, Dr. McKinley said: "He definitely has beyond the shadow of a doubt a chronic schizophrenic disorder." That was his opinion on January 12, 1987, and was the second time he had seen Billiot. At the request of Dr. Michael Whelan (Clinical Director of the Department of Psychiatry at Parchman), Dr. McKinley examined Billiot and prescribed Mellaril, an anti-psychotic drug, for him. Billiot had also requested Mellaril.
Dr. McKinley next saw Billiot on February 17, 1988, again at the request of Dr. Whelan, for evaluation and the possible need for medication. This time, Dr. McKinley prescribed the drug Trilafon for Billiot. He testified that while there are some differences chemically between Mellaril and Trilafon, they actually come from the same group of drugs known by the generic name of phenothiazine. They are both anti-psychotic, anti-schizophrenic medication.
Dr. McKinley and Billiot discussed the medication prior to Dr. McKinley prescribing Trilafon for him. Billiot told him he needed something to calm down his nerves, and that he could give him anything but Mellaril. Billiot said he was not familiar with Trilafon, but that if Dr. McKinley said to take it, he would. Dr. McKinley told him to try it to see if it calmed his nerves. He prescribed Trilafon in a moderate dose along with Benadryl for possible side effects that might develop  Billiot had no objection to the Benadryl. Trilafon targets and suppresses symptoms of schizophrenia, for example, catatonic excitement, delusion, hallucinations  positive symptoms of schizophrenia. The symptoms of schizophrenia can be brought under control within four weeks to where they are not present, or at least not as intense or as frequent. However, the individual still has schizophrenia.
Dr. McKinley thought Billiot was definitely schizophrenic. He thought he should be classified as disorganized type as much as paranoid type schizophrenic. He based this finding on Billiot's psychiatric history, his talks with Dr. Whelan, and his personal contacts with Billiot. He said that at the time of the hearing, he had no opinion as to whether Billiot was competent to be executed. He said he had not seen Billiot since February, 1988, and he would want to evaluate him on the day of the hearing to make a finding of competency. He stated this because schizophrenics are very ambivalent  their thinking can rapidly turn. Dr. McKinley furthermore said:
Well, we don't  all schizophrenics don't present alike. We have different types of schizophrenia, but the disease, regardless of the type of schizophrenia it is, over the chronic course of the illness are characterized by exacerbation and remissions or relapses and remissions. In other words, a person at some time in the evolution of his schizophrenia can appear, when he's in remission, as totally normal. Or he may show some residual signs of a thought disorder when he's in partial remission or what we call a residual state of illness, when he is not actively psychotic. So over a period of time, we know that if someone has had two or three breaks with reality, that is, psychosis, any schizophrenic evolution of his illness or the natural history of the illness or been hospitalized two or three or more times for schizophrenic episodes of the acute variety, the illness is probably going to be chronic and characterized by exacerbations or remissions with or without anti-schizophrenic medication and he's never going to be completely well again.
Based on his evaluations of the records, Dr. McKinley stated Billiot has chronic schizophrenia  a longstanding, probably irreversible mental illness. In order to determine competency at the time of the hearing, Dr. McKinley stated that he would want to supplement his clinical interviews with psychological evaluation, including testing  a brain scan, maybe an EEG.
On cross-examination, Dr. McKinley admitted that one who is a paranoid schizophrenic could still be competent to be executed. He said he saw Billiot three times over three years (1985-1988) for the purpose of *6 treating Billiot and evaluating his condition, and that he was not really familiar with the Parchman files, Dr. Whelan's report, or the interview conducted by Dr. Guild and Dr. Stanley, at the time of the hearing. He also stated that some of the drugs Billiot admitted to taking during the interview with Dr. Guild and Dr. Stanley  cocaine, speed, downers, LSD, PCP, marijuana, etc., could result in a condition that mimics schizophrenia if taken in high enough dosage or over a long period of time. Dr. McKinley further agreed that anyone who kills three members of his family has anti-social tendencies.
On redirect examination Dr. McKinley testified that a man of normal intelligence could still be incompetent to be executed. A man could be intelligent and still be unable to appreciate the significance between the act for which he was convicted and the execution he will suffer because of the conviction.
On recross, Dr. McKinley said that at times Billiot was not compliant with his medication regimen. He said it is not uncommon for a schizophrenic to be non-compliant because they think the anti-psychotic drugs are harmful. He also agreed that drug abusers or users sometimes dislike psychiatric medication because it can produce a dysphoric (unpleasant) feeling.
Finally, on further redirect, Dr. McKinley said that although drug abuse could mimic schizophrenia, it could also be a contributing factor to incompetency. That is, one could be incompetent as a result of schizophrenia combined with former drug abuse.
The next witness called by Billiot was Dr. Michael Whelan (Dr. Whelan), the Director of the Department of Psychiatry at Parchman. A consulting psychiatrist, Dr. DiGaetano, requested Dr. Whelan to give a battery of tests to Billiot in March, 1984. Dr. Whelan said he had seen Billiot sporadically since that time on visits to death row, and a couple of times when Billiot was admitted to the hospital. He was admitted to the hospital as recently as two months prior to the competency hearing.
Following the battery of tests Dr. Whelan administered, in approximately early 1985, he spent fifteen (15) to twenty (20) hours compiling a written report. He prepared the report as a work sample to be submitted to the American Board of Forensic Psychology  that is why it contains initials J.B. instead of the name James Billiot. Dr. Whelan said he tested Billiot in a number of areas  personality, intelligence, speech and perception, tactual performance. He also obtained an extensive history from Billiot's first trial, Mississippi State Hospital records, and pre-1980 records from Whitfield and the East Mississippi Hospital. He stated that he compiled as much information as possible because history is very important when doing a psychological or psychiatric analysis.
Billiot was found to be of average intelligence after taking the Wechsler Adult Intelligence Scale (WAIS) test. However, Billiot scored very low on a sub-test  the most sensitive measure of organic dysfunction. That low score could be associated with the impairment of frontal-lobe abilities. That is, the tests indicated that some functions usually associated with the frontal part of the brain were impaired. Other tests conducted by Dr. Whelan revealed that Billiot had symptoms of delusions of reference (where a person will attach a particular significance to some event in his life that is clearly irrational or out of touch with reality), "delusions of grandiosity, nihilism and persecutory content."
Dr. Whelan stated that the day before he testified, Billiot walked past him while he was talking with Dr. McKinley and stated something about demons and the devil overthrowing the kingdom and that he had been an angel. Also, in his 1985 written report, Dr. Whelan, speaking of Billiot, stated that "[h]e is now firmly entrenched in a delusional system which permits him to acknowledge the fact that he did indeed murder the Croll family, but which permits an absolution of his guilt." Dr. Whelan did not know, at the time of the hearing, if Billiot was still entrenched in a delusional system because he had not had occasion to examine him.
Dr. Whelan signed an affidavit in 1985 which had been prepared by Amy Whitten, who was associated with the Attorney General's office at that time, which stated that he believed Billiot was competent to be executed *7 pursuant to Miss. Code Ann. § 99-19-57(2). He could not give an opinion in November, 1988, as to whether or not Billiot was competent to be executed because he had not "evaluated him specific to the issues contained in the statute for more than three years." Dr. Whelan stated that he would prefer to extensively examine Billiot within a few days of the hearing on the question of his competency before he would feel comfortable giving an opinion on the issue. He did state that an individual can be psychotic and competent or psychotic and incompetent.
On cross examination, Mr. Sonny White asked Dr. Whelan questions after referring him to the transcript of the examination of Billiot conducted by Dr. Guild and Dr. Stanley on March 22, 1988, approximately eight months prior to this hearing. Dr. Whelan agreed that at that time Billiot had an understanding of the sentence he received, what would happen to him if that sentence were carried out, a comprehension of the finality of death, a belief in a life after death, a comprehension of the crime he committed, an ability to assist his attorneys, an understanding of the appeals process for death penalty cases and the length of time it takes to carry out a death sentence. Billiot also exhibited a desire not to be put to death when he was asked whether he would rather be executed by the gas chamber or lethal injection  he replied that he would choose neither one.
Further, there had been some question that Billiot might think he was actually another person named T.K. or T. Kincaid. Dr. Whelan agreed that in his interview with Dr. Guild and Dr. Stanley, Billiot adequately explained away that concern by saying that he had a nickname  that he used to be called "the Kid Kincaid." In that same interview, when asked whether he had any special powers, Billiot said: "No, not really." Dr. Whelan agreed that this showed that Billiot was in touch with reality  that he did not think he was some supernatural force or have supernatural powers that would prevent the state from executing him.
At the time Dr. Whelan submitted his affidavit in 1985, he thought Billiot was competent to be executed. The fact that he also diagnosed Billiot as being a paranoid schizophrenic did not change his opinion  in other words, in Dr. Whelan's opinion, one can be a paranoid schizophrenic and still be competent to be executed. He stated, however, that Billiot's condition is subject to change, and that if he became "floridly psychotic," he could then be determined to be incompetent for execution. Dr. Whelan stated that he had never seen Billiot "floridly psychotic."
On redirect, Billiot's counsel asked Dr. Whelan about Billiot being stabbed in prison a couple of months prior to the hearing. Dr. Whelan's report about the incident stated: "He voices no reason why he might have been stabbed, although security staff relate that James was constantly talking to demons and spirits throughout the night and because he wouldn't be quiet, Harper decided to silence him." Billiot's counsel referred Dr. Whelan back to the Dr. Guild/Dr. Stanley report. He pointed out that Mr. Sonny White started reading in the middle of the paragraph when he was able to get Dr. Whelan to agree that Billiot comprehended his crime  Billiot actually said that his crime was not that bad  that it was just a family dispute. He then agreed that Billiot's judgment was impaired. Finally, Dr. Whelan stated that regardless of what Billiot said in the Guild/Stanley evaluation interview, he could not say whether Billiot was competent to be executed at the time of the competency hearing.
Dr. William Johnson (Dr. Johnson) was called to testify by Billiot. He is a professor of psychology at the University Medical Center, and was accepted as an expert witness. Dr. Johnson first met Billiot in July, 1982. He interviewed him once or twice a week for the length of his stay at the Whitfield maximum security unit. Billiot was at Whitfield at that time for the purpose of determining whether or not he was competent to stand trial. Dr. Johnson supervised the administration of psychological tests on Billiot. He also diagnosed Billiot as having paranoid schizophrenia in November, 1986. Dr. Johnson testified that since that time, and in preparation for the 1988 competency hearing, he studied a vast amount of information on James Billiot, including the Guild/Stanley report. He also spoke with two of Billiot's *8 aunts, and generally "tried to leave no stone unturned."
Dr. Johnson also interviewed Billiot on March 22 or 23, 1988, very near the same time Billiot was interviewed by Dr. Guild and Dr. Stanley. He examined him in light of the Mississippi statute regarding competency to be executed, focusing on those issues of Billiot's understanding of his appeal process: whether he knew what he was tried for; whether he had a rational understanding of the penalty that he received; whether he understood his impending fate; and whether he could cooperate with his attorney. He prepared a report based on that interview in July, 1988. He found that Billiot was not competent to be executed. He stated that Billiot could not make a connection between his role in the crime and what the state had decided to do to him.
He also testified that he had seen Billiot for one-half hour the morning before he testified in the competency hearing. He found him incompetent for execution at that time as well. He said Billiot was unaware of the proceedings against him  he thought he could still plead not guilty to the crime. When asked to give his professional opinion on the question of Billiot's competency, Dr. Johnson said:
[Billiot] does not have a rational understanding of the proceedings; ... he does not understand the  he knows what he was tried for in a factual sense, but rationally he can't connect what he was tried for and ... the penalty and his actions. He can't relate those. And he also feels that  and believes that he will never be executed. He understands that he has  in a factual sense that he has received the death penalty, but he will tell you that the State will try to execute him but will not be successful due to his powers and so on.
Dr. Johnson furthermore stated:
If you tell him or you ask him what has happened, what did the court do, in a factual sense, he may be able to tell you. Sometimes he can; sometimes he cannot. If you then ask him and follow that question up to try and have him relate, for example, if he says, "I was found guilty of capital murder. I've been sentenced to death." If you try then to get him to relate it to the crime, typically, most often, he cannot do that. Many times he denies that he committed the crime. Sometimes he admits it. He almost invariably says that there was an omen going around and that he had no choice but to commit the crime, if, in fact, he ... says that he does do it. Yesterday he told me that he did not do it and that he was going to come up with an alibi and that he was going to plead not guilty and that he had an alibi. So it's highly variable ... there is some consistency which is that it is bizarre whatever ... he states about ... his role in the crime.
Dr. Johnson has believed Billiot to be a schizophrenic from the time he first saw him in 1982. During his testimony, he noted that Billiot's "thinking is very delusional, consisting of preoccupation with demons, with witchcraft. He has a great deal of grandiosity, thinking to some extent that he has had other existences; that he can take on the identities of other individuals, whether it be Jesus Christ, Pancho Villa or Lucifer, Attila the Hun, Julius Caesar, Napoleon."
Dr. Johnson said that when Billiot first arrived at Whitfield, the staff was concerned that he was malingering or feigning symptoms. He determined, based on Billiot's case history prior to his admittance to Whitfield, his history of being abused as a child, the neglect he suffered, and his genetic predisposition for the symptoms, that Billiot was not malingering. With regard to the interview conducted by Dr. Guild and Dr. Stanley, Dr. Johnson said he would have more vigorously pursued Billiot's responses. Dr. Johnson stated that an overwhelming majority of the time his testimony supports the state. He has only twice testified for the defense before his testimony at this competency hearing  once in Billiot's trial, and once in a trial in Hernando, Mississippi in 1983.
On cross examination, Dr. Johnson was reminded of two other instances where he submitted affidavits in support of the defense in capital murder cases. He said that he had never been fooled by a malingerer. He admitted that there was disagreement at Whitfield *9 with regard to whether Billiot was responsible for his crime. Dr. Johnson stated that he is philosophically opposed to the death penalty, but that it does not interfere with his clinical analysis. He admitted that someone can be a paranoid schizophrenic and still competent to be executed. Dr. Johnson stated that someone suffering from paranoid schizophrenia with psychosis is not competent to be executed, and that a paranoid schizophrenic without psychosis may or may not be competent to be executed.
The state first called Dr. Henry A. Maggio (Dr. Maggio). Dr. Maggio testified that he examined Billiot in 1982 and again in 1988. In 1982 he found Billiot competent to stand trial. He also testified that Billiot was competent to be executed.
On cross examination, Dr. Maggio admitted that he conducted no formal psychological testing on Billiot in January, 1982. He also agreed that schizophrenia fluctuates  that one's competency to be executed can come and go.
On redirect, Dr. Maggio stated that Billiot fits within the normal range in intelligence. He also stated that he did not diagnose Billiot as a paranoid schizophrenic, but rather as having anti-social personality disorder. He said paranoid schizophrenics can be competent to be executed. Finally, Dr. Maggio said that Billiot has known what he has been doing all along  that he wants everyone to "believe that he's a lot of other things that he is not."
The state next called Dr. Guild. He is a licensed attorney in the state of Mississippi as well as being a psychiatrist. As mentioned above, Dr. Guild examined Billiot along with Dr. Stanley on March 22, 1988. He said that in his opinion Billiot was clearly competent to be executed at the time of the interview. He said he listened to the tape of the interview and indicated that it was very significant that Billiot said he could not choose between forms of execution  that Billiot was able to joke about it a little. To Dr. Guild, this was a strong indication that Billiot was in touch with reality. Dr. Guild also expressed the opinion that Billiot's downplay of the crime was an example of rationalization and denial that he sees all the time in inmates like Billiot.
It was furthermore Dr. Guild's opinion that Billiot was malingering. He said he had been fooled by a malingerer before. He said it is incredible for a doctor to claim that he has never been fooled. Dr. Guild also placed significance on the fact that Billiot stated that he did not have fantastic powers. He furthermore stated that Billiot understood the proceedings, that he understood he could be executed, and that he understood the finality of death.
Dr. Guild admitted that some of Billiot's behavior has been less than cooperative with his lawyers (he once refused to sign a release of a taped interview and another time requested Playboy and Penthouse magazines prior to signing a release), but stated that the ability to assist and the willingness to assist are two different things.
On redirect, Dr. Guild found it to be very significant that Dr. Whelan never saw Billiot in a psychotic state. It must be noted here that Dr. Whelan did not testify that he never saw Billiot in a psychotic state; rather, he said he never saw Billiot in a "floridly psychotic" state. Dr. Guild stated that he changed his mind after hearing testimony from the other doctors and determined that Billiot may very well be schizophrenic.
Upon being called by the state, Dr. Stanley explained malingering and said he had been fooled several times. He also said that it is an incredibly naive statement to claim to have never been fooled by a malingerer. He testified that Billiot is average in intelligence, and that on the Minnesota Multiphasic Personality Inventory Profile Test, Billiot scored an 8, 4, 7 profile  characteristic of anti-social personality disorder, not paranoid schizophrenia. He further stated that when he interviewed Billiot in March, 1988, he had a better understanding of capital murder than most people. Dr. Stanley, like Dr. Guild, placed significance on the fact that Billiot did not want to choose a form of execution and that Billiot admitted to having no special powers. He stated that Billiot was competent to be executed.
*10 He admitted on cross examination that competency is perishable, fluid. He said that is why an eleventh hour examination was done on Jimmy Gray to make sure he was competent. Dr. Stanley also felt Billiot was malingering. However, he admitted that Billiot stated in the interview that he did not "have any bad mental problems" and that he did not "feel insane."

STATEMENT OF THE LAW

I.

IS BILLIOT ENTITLED TO DE NOVO REVIEW ON APPEAL OF THE DENIAL OF POST-CONVICTION RELIEF?
Billiot's argument for de novo review is based on the cases Balfour v. State, 598 So.2d 731, 739 (Miss. 1992), Irving v. State, 361 So.2d 1360, 1363 (Miss. 1978), and Fisher v. State, 481 So.2d 203, 211 (Miss. 1985), which set forth the general proposition that death penalty cases receive heightened review on appeal. These cases are, however, direct appeals. Moreover, while death penalty cases receive heightened review on appeal, these cases do not stand for the proposition that a defendant is entitled a de novo review as alleged by Billiot.
Billiot is correct that Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), is an assertion that it is unconstitutional to execute an insane person. Ford v. Wainwright does not hold, however, that the appeals court must conduct a de novo review. In Ford, the United States Supreme Court reversed because Florida's procedures for determining insanity were not adequate and therefore the habeas petitioner was entitled to an evidentiary hearing in the district court, de novo, on the question of the defendant's competency to be executed. Id. at 418, 106 S.Ct. at 2606. Billiot has received a two day post-conviction evidentiary hearing on the exact same issue.
Billiot relies on Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), which involves defamation of a public figure and is not applicable to this case. In Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), the Supreme Court examined the facts to make sure the petitioner's constitutional rights were not violated by the lower court's refusal to conduct a full hearing on the question of his competency to stand trial. The Court found that Drope was entitled to be found competent by a full hearing before being tried and ordered a new trial. Our Court examined the facts presented by Billiot in this case on application for post-conviction relief, remanded the case to the circuit court for a full evidentiary hearing, which was conducted, and the trial court determined that Billiot was competent to be executed. Billiot's reliance on Drope is of no avail to him under these facts.
The state relies on Addkison v. State, 608 So.2d 304 (Miss. 1992), for the assertion that the proper standard of review in this case is that this Court may not reverse the circuit court's ruling unless it is found to be manifestly against the overwhelming weight of the evidence. Speaking for the Court in Addkison, Justice Banks stated:
The rule and the cases interpreting both rule and statute imbue the trial court with great discretion in determining the issue of competency to stand trial. In Emanuel v. State, 412 So.2d 1187 (Miss. 1982), this Court outlined the procedure to be followed when there is a question of the defendant's mental competency to stand trial. There the Court commented
[w]hen the competency of a defendant to stand trial is raised, the trial court should preliminarily, prior to trial, conduct a hearing to determine whether there is a probability that defendant is incapable of making a rational defense.
* * * * * *
After hearing all the evidence, the trial judge should weigh the evidence and make a finding as to whether there is a probability that defendant is incapable of making a rational defense. If the evidence shows such a probability, then the trial court should impanel a jury to decide that issue prior to trial on the merits.

*11 If the trial court is of the opinion, after weighing the evidence both for the state and the defendant, that there is not sufficient proof to show a probability that defendant is incapable of conducting a rational defense, he should make such finding a matter of record. The case may then proceed to trial on the merits.
When the trial court has made a finding that the evidence does not show a probability that the defendant is incapable of making a rational defense, we will not overturn that finding unless we can say, from the evidence, that the finding was manifestly against the overwhelming weight of the evidence. The evidence must show more than a possibility that defendant is incompetent to stand trial  the evidence must go further until it appears to the trial court that there is a probability that defendant is incapable of making a rational defense. In this initial inquiry, the trial judge must weigh the evidence and be the trier of facts.
Addkison, 608 So.2d at 309. We reversed the lower court in Addkison because the "evidence before the court on Addkison's motion for a preliminary determination of competence was a sufficient threshold showing entitling him to a full hearing." Id. at 310. We also determined that a preliminary determination of competency to stand trial does not have to be submitted to a jury. Id. at 311.
Billiot responds that Addkison is not controlling authority, as it stands for our review of "a trial court's finding as to whether an individual has submitted sufficient evidence to show that he or she is entitled to a full hearing on the issue of competency to stand trial." Presumably, had the lower court in Addkison held a full evidentiary hearing and determined that Addkison was competent to stand trial, we would have upheld that ruling absent a finding that it was manifestly against the overwhelming weight of the evidence. Because this case was remanded for a full hearing on the issue of Billiot's competency to be executed, it stands to reason that we would accord at least the same deference as if this were a direct appeal of a trial court's finding of competency to stand trial.
Miss. Code Ann. § 99-19-57(2) provides:
(2)(a) If it is believed that a convict under sentence of death has become insane since the judgment of the court, the following shall be the exclusive procedural and substantive procedure. The convict, or a person acting as his next friend, or the commissioner of corrections may file an appropriate application seeking post conviction relief with the Mississippi Supreme Court. If it is found that the convict is insane, as defined in this subsection, the court shall suspend the execution of the sentence. The convict shall then be committed to the forensic unit of the Mississippi State Hospital at Whitfield. The order of commitment shall require that the convict be examined and a written report be furnished to the court at that time and every month thereafter stating whether there is a substantial probability that the convict will become sane under this subsection within the foreseeable future and whether progress is being made toward that goal. If at any time during such commitment the appropriate official at the state hospital shall consider the convict is sane under this subsection, such official shall promptly notify the court to that effect in writing, and place the convict in the custody of the commissioner of corrections. The court shall thereupon conduct a hearing on the sanity of the convict. The finding of the circuit court is a final order appealable under the terms and conditions of the Mississippi Uniform Post-Conviction Collateral Relief Act.

(b) For the purposes of this subsection, a person shall be deemed insane if the court finds the convict does not have sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the purpose of his punishment, the impending fate which awaits him, and a sufficient understanding to know any fact which might exist which would make his punishment unjust or unlawful and the intelligence requisite to convey *12 such information to his attorneys or the court.
(Emphasis added)
On remand for an evidentiary hearing, Billiot was required to show by a preponderance of the evidence that he was entitled to relief. Miss. Code Ann. § 99-39-23(7) (Supp. 1993).
We are not convinced that this issue should not be reviewed, just as would any other post-conviction relief issue, provided the trial court properly conducted a full postconviction evidentiary hearing and applied the proper legal standard. Due process does not require that we conduct a de novo review.
The circuit judge stated in his Findings of Fact and Conclusions of Law that he relied on Miss. Code Ann. § 99-19-57(2)(b) (Supp. 1988), and Ford v. Wainwright to determine Billiot's competency to be executed. The trial judge found that Billiot failed to prove by a preponderance of the evidence that he was not competent to be executed.
Billiot was afforded due process and the trial court's ruling on this post-conviction relief question can only be reversed if it is against the overwhelming weight of the evidence or an abuse of discretion. Billiot is not entitled to de novo review.

II.

DOES THE EVIDENCE SUPPORT THE TRIAL COURT'S FINDING THAT BILLIOT IS COMPETENT TO BE EXECUTED?
Under this assignment, Billiot first claims that the trial court's findings are entitled to less deference than they would normally be accorded because the trial court adopted the state's proposed findings and conclusions of law verbatim. Billiot's contention is supported by the law in this state. Rice Researchers, Inc. v. Hiter, 512 So.2d 1259 (Miss. 1987); Omnibank v. United Southern Bank, 607 So.2d 76 (Miss. 1992); Chamblee v. Chamblee, 637 So.2d 850, 858-59 (Miss. 1994). Although Rice Researchers, Omnibank and Chamblee are all cases in which the chancellor was accorded less deference on appeal, there is no apparent reason the analysis should not be equally applied to a situation where a trial court judge sits as the trier of fact over a criminal evidentiary hearing of this magnitude.

A. Whether the trial court's finding is error?
Billiot is correct that everyone, including the state's expert witnesses, agreed that a person's competency to be executed is subject to change, or "perishable." Dr. Guild, one of the two state's experts who interviewed Billiot on March 22, 1988, approximately eight months prior to the competency hearing, stated that at the time of the interview, Billiot did not suffer from psychosis and that "[i]t means that he is not crazy now. It does not mean that he could not have been crazy in the past or in the future." Dr. Guild stated that "a man can be competent one time and then three months later, it's very possible that he will become incompetent." Dr. Stanley agreed that competency is perishable.
Dr. McKinley said he could not give an opinion on Billiot's competency as he had not evaluated the man since February, 1988. Dr. McKinley would want to evaluate Billiot on the day of the hearing to make his finding of competency. Although Dr. Whelan submitted an affidavit in 1985 stating that in his opinion Billiot was competent to be executed, he would not give an opinion on the day of the hearing. He declined to do so because he had not "evaluated Billiot specific to the issues in the statute for more than three years."
In the opinion of Dr. Johnson, Billiot was not competent to be executed. Dr. Johnson examined Billiot at approximately the same time he was interviewed by Dr. Guild and Dr. Stanley. He also spoke with him for thirty (30) minutes the day before the hearing.
The state relies on three cases for the assertion that the court properly relied on the expert witness testimony: Hill v. State, 432 So.2d 427, 437 (Miss. 1983); Wheeler v. State, 536 So.2d 1347, 1354 (Miss. 1988); and, Greenlee v. State, 437 So.2d 1010, 1012 (Miss. 1983). These cases all hold that the trial *13 court did not commit error by refusing to order further psychiatric examination of a defendant who had already been examined and found competent to stand trial. In the Hill case the determination was made as much as several months before the trial took place.
In Hill, we reasoned that the defendant must have been competent to assist his attorney because a psychologist administered a test just prior to trial, and that psychologist was not called to testify at the guilt or sentencing phases of trial. We concluded that if the psychologist had learned something beneficial he would have been called to testify. Id. at 437-38. In Wheeler, there was only a one month delay between examination and trial. In Greenlee, we noted that the judge has broad discretion in initially determining whether a competency examination and hearing is warranted. Thus the trial court's in-court determination that no further psychiatric evaluation was needed based on the defendant's demeanor, five months after the defendant had been examined and found competent to stand trial, was not error.
Billiot's situation is somewhat different, but the trial court still did not commit error warranting reversal when it relied on the testimony from doctors who had interviewed Billiot eight months prior to his competency hearing. There can be no question that the delay was not ideal  the state experts agreed that Billiot's competency could change between the time he was interviewed and the time of his hearing. However, based on the case law, the trial court did not commit reversible error. It should be remembered that Billiot was required to prove that he was entitled to relief by a preponderance of the evidence. Miss. Code Ann. § 99-39-23(7) (Supp. 1993).
While it is not clear from the record that the majority of the staff at Whitfield disagreed with Dr. Johnson's 1982 determination that Billiot was not responsible for his crime, Dr. Johnson did admit on cross examination that there was disagreement at Whitfield on that issue. Billiot argues that the trial judge was incorrect in finding that Dr. Maggio found Billiot to be sane in 1982. Dr. Maggio did find Billiot competent to assist his attorney and sane enough to stand trial in 1982.
Billiot is right to complain that Dr. Maggio did not rely on the relevant criteria when he interviewed him to determine his competency to be executed. It is also true that at least in part the trial judge relied on Dr. Maggio's determination that Billiot was competent to be executed. However, while Dr. Maggio admitted that he did not rely on the execution statute or the Ford v. Wainwright criteria when he interviewed Billiot, he testified that he later learned of that criteria and that Billiot met it at the time of their interview.
Billiot's argument that the state experts did not spend enough time with him to render opinions that he is of average intelligence is refuted by the record in that everyone who testified on the issue stated that the tests proved this fact. It was never established that Billiot does not have the ability to cooperate and assist his lawyers; rather, it was established that on two occasions he refused to cooperate in his defense.
It was not clearly erroneous for the trial court to conclude:
The only expert to state that Billiot was not presently competent to be executed was Dr. William Johnson. Dr. McKinley offered no opinion. The other experts stated that Billiot was competent at the time they examined him. The fact that these examinations have taken place at differing times over several years and in each instance he has been competent forces the Court to the conclusion that Billiot is presently sane and competent to be executed....
Even though Dr. Johnson was persuasive in that he had done more recent and more extensive research on the issue of Billiot's sanity, it is not error that the trial judge refused to give Dr. Johnson's testimony outcome determinative status.

B. Whether the state's expert testimony was irrelevant and incompetent; whether the opinions were too remote in time, and whether they were based on interviews done while Billiot was under the influence of anti-psychotic drugs administered without his consent?
Billiot argues that the state's expert testimony should have been held to be inadmissible *14 because the experts relied on incomplete and inaccurate facts and because they did not rely on methodologies generally accepted in the psychiatric community.
Billiot relies on a four-part test enunciated in Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1110 (5th Cir.1991):
(1) Whether the witness is qualified to express an expert opinion, Fed.R.Evid. 702;
(2) Whether the facts upon which the expert relies are the same type as are relied upon by other experts in the field, Fed.R.Evid. 703;
(3) Whether in reaching his conclusion, the expert used a well-founded methodology, Frye v. United States, 293 F. 1013 (D.C. Cir.1923); and
(4) Assuming that the expert's testimony has passed Rule 702 and 703, and the Frye test, whether under Fed.R.Evid. 403 the testimony's potential for unfair prejudice substantially outweighs its probative value.
Billiot essentially argues that the state's experts did not meet the requirements of steps two and three for admissibility. However, the state's experts testified under oath that they relied on the relevant Mississippi statute pertaining to competency for execution and the United States Supreme Court case Ford v. Wainwright in rendering their expert opinions. These were the same criteria relied on by the experts called to testify on behalf of the defense.
Although Dr. Johnson clearly did more extensive research than the other experts who testified, all the experts agreed that one can be schizophrenic and still competent to be executed. Therefore, Dr. Guild's statement that, after hearing testimony in this hearing, he would reconsider his diagnosis that Billiot was not schizophrenic, does not change the bottom line  that the question of whether or not Billiot is competent under the statute and the Ford case was answered by the experts who rendered an opinion after interviewing Billiot. The expert testimony was admissible and it was not error for the trial judge to rely on it.

III.

WHETHER THE EVIDENCE WAS EXAMINED UNDER INCORRECT LEGAL STANDARDS?

A. Whether the trial court erred in applying a legal presumption that Billiot is competent to be executed?
Billiot argues that there was no presumption for the trial judge to rely on that he was competent to be executed because of this Court's decision in, Billiot v. State, 515 So.2d 1234 (Miss. 1987).
In the 1987 Billiot, 515 So.2d 1234, we found that he made the threshold showing that he was entitled to a full evidentiary hearing on the question of his competence to be executed. We said, "[b]ecause we find Billiot's pleading to suggest with statutory and factual particularity that he may be legally insane and thus protected from execution, we remand this case to the Circuit Court of the First Judicial District of Harrison County for a hearing on the limited issue of Billiot's present sanity." Id. at 1235 (emphasis added). We further said:
Undoubtedly, Billiot has presented allegations under oath which, if true, bring into serious question the legality of execution under both state and federal law. In the face of this fact-backed pleading, we acknowledge Billiot's "claim procedurally alive `substantially showing denial of a state or federal right'," and conclude that he "is entitled to an in-court opportunity to prove his claims."
Id. at 1237 (emphasis added) (citation omitted). The reasoning contained in the above quote is based on Miss. Code Ann. § 99-39-27(5) and (6) (Supp. 1994) which gives this Court the power to grant a defendant's postconviction application to proceed in trial court on a request for post-conviction relief as long as "it appears from the face of the application, motion, exhibits and the prior record that the claims presented by such are not procedurally barred under section 99-39-21 and that they further present a substantial showing of the denial of a state or federal right... ."
*15 Additionally, in Billiot we remanded for an evidentiary hearing pursuant to Miss. Code Ann. §§ 99-39-23 and 99-39-27 (Supp. 1986). Section 99-39-23(7) (Supp. 1994) explicitly states, "[n]o relief shall be granted under this chapter unless the prisoner proves by a preponderance of the evidence that he is entitled to such." The burden was clearly on Billiot to show by a preponderance of the evidence that, at the time of the hearing, he was incompetent to be executed. It is reasonable to conclude that even after he made the threshold showing that entitled him to proceed in trial court on motion for postconviction relief, Billiot faced a presumption that he was sane and competent to be executed.
Billiot further attacks the presumption under M.R.E. 301, saying that once he produced evidence from Dr. Johnson that he was incompetent, the presumption of his competency vanished. The argument is not persuasive. M.R.E. 301 states:

In all civil actions and proceedings not otherwise provided for by act of the Legislature or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.
(Emphasis added)
The comment to the rule states that "Rule 301 is only concerned with presumption in civil proceedings." When this Court granted Billiot's application, he was entitled to proceed in trial court in an attempt to show, by a preponderance of the evidence, that he was not competent to be executed. He bore the burden of the proof and the risk of nonpersuasion.

B. Whether Billiot presented sufficient evidence to shift the burden of proof should have shifted to the state?
Here Billiot argues that the facts in the record so substantially weigh in favor of finding that he is insane and incompetent for purposes of carrying out his execution that the trial court committed error by not shifting the burden of proof to the state. One could clearly find from this record that Billiot is a schizophrenic and otherwise suffers from various forms of mental illness. However the record also clearly shows that all experts agreed that one could be schizophrenic and still competent to be executed. A determination of legal insanity for purposes of execution is not the same thing as finding that someone suffers from mental illness.
Under the present state of law the trial judge had no authority to shift the burden of proof to the State of Mississippi.

C. Whether the trial court's interpretation of § 99-19-57(2)(b) is constitutional error?
Billiot essentially argues here that the trial judge committed error by placing too much emphasis on his intelligence, and not enough emphasis on his rational understanding of his predicament and fate, in determining that he was not entitled to post-conviction relief. The record reflects that the judgment of the trial court was based upon the proper standards  the statute and Ford v. Wainwright.
It is not clear from the cited authority that the trial judge's reasoning was inconsistent with constitutional principles and federal interpretation. It is true that the state's experts, and for that matter everyone who testified on the subject, agreed that Billiot is a man of average intelligence. It is not clear however that this factor was so exclusively relied on that it renders the opinion and judgment of the trial court reversible. In fact, intelligence is a relevant factor to consider in a competency hearing. It is certainly conceivable that one could be so intellectually deficient that one could not possibly comprehend one's crime, have a rational understanding of what it means to be executed, understand that one is to be executed, have the ability to rationally connect his crime with the fact that he will be executed, or have the ability to assist counsel.
The trial court's ruling explicitly states that it relies on the criteria as set forth in the United States Supreme Court decision of Ford v. Wainwright. Billiot's argument that § 99-19-57(2)(b) is itself unconstitutional is *16 unpersuasive. The interpretation given to that statute by the trial judge incorporated reliance on the Ford case. The statute does not unconstitutionally restrict rights of defendants in light of the Ford v. Wainwright.
The essence of the holding in Ford is that a death row inmate must not be insane when he is executed. He must comprehend the reasons for the penalty and its implications, he must understand "the penalty's existence and purpose," and in order for the retributive goal of the criminal law to be satisfied, he must "perceive[] the connection between his crime and his punishment," and be "aware that his death is approaching [so] he can prepare himself for his passing." Id., 477 U.S. at 417, 422, 106 S.Ct. at 2605, 2608.
The Mississippi statute, § 99-19-57(2), states:
(b) For the purposes of this subsection, a person shall be deemed insane if the court finds the convict does not have sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the purpose of his punishment, the impending fate which awaits him, and a sufficient understanding to know any fact which might exist which would make his punishment unjust or unlawful and the intelligence requisite to convey such information to his attorneys or the court.
The Mississippi statute is harmonious with the import of the Eighth Amendment prohibition against cruel and unusual punishment as interpreted in Ford v. Wainwright. Furthermore, the trial judge considered Ford when he reached his conclusion. Stated differently, the statute as interpreted by the trial court is not incongruous with the federal constitutional mandate in this area.

IV.

WHETHER THE STATE VIOLATED BILLIOT'S RIGHTS TO DUE PROCESS?
Billiot prefaces this assignment by citing Ford v. Wainwright for the proposition that on review of a proceeding relevant to the potential taking of a human life, it is incumbent upon a Court to have a "heightened concern for fairness and accuracy." Ford, 477 U.S. at 414, 106 S.Ct. at 2604.
The issue before the Court in Ford v. Wainwright was whether or not the district court erred by not holding an evidentiary hearing on the issue of the petitioner's sanity. The language quoted by Billiot was used by the United States Supreme Court to preface the belief that "any procedure that precludes the prisoner or his counsel from presenting material relevant to his sanity or bars consideration of that material by the factfinder is necessarily inadequate." Id. It must be remembered that this Court expressly remanded this case for an evidentiary hearing in light of the Ford decision so as to uphold the import of the Eighth Amendment and due process.

A. Whether the use of drugs without having first advised his hearing attorneys and without Billiot's consent violated his rights to due process?
Billiot claims that his due process rights were violated when he was given anti-psychotic drugs without his consent. He argues that without a showing by the state that the treatment was in his best interest and that the medication was necessary to avoid danger to himself or others at Parchman, it was impermissible for the state to administer the drugs. He also argues that it was impermissible to medicate him without first giving him notice and the opportunity to be heard.
The state responds that this assignment is waived because Billiot's counsel failed to make a timely objection or develop testimony on what affect the medication might have had for the purposes of Billiot's mental health examinations. In a similar situation, we have recently stated:
Obviously if the State is correct in its contention that this assignment is waived for lack of a sufficient contemporaneous objection, then any potential merit is irrelevant. This Court has held that, "if no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case." Russell v. State, 607 So.2d 1107 (Miss. 1992); Cole v. State, 525 So.2d 365, 369 (Miss. 1987), cert. denied 488 U.S. 934 [109 *17 S.Ct. 330, 102 L.Ed.2d 348] (1988); Irving v. State, 498 So.2d 305, 319 (Miss. 1986). However, the Court does have prerogative in death penalty cases of relaxing the contemporaneous objection and plain error rules when justice so requires. Hansen v. State, 592 So.2d 114, 142 (Miss. 1991) (procedural niceties give way to the search for substantial justice); Williams v. State, 445 So.2d 798 (Miss. 1984) cert. denied 469 U.S. 1117 [105 S.Ct. 803, 83 L.Ed.2d 795] (1985); Culberson v. State, 379 So.2d 499, 506 (Miss. 1979).
Harrison v. State, 635 So.2d 894, 903 (Miss. 1994). Harrison was forcibly injected prior to his trial. At the hearing to determine whether the court would order forcible injection of the anti-psychotic drug Haldol, the defense attorney generally objected to the forced medication of his client, stating "[w]e, of course, will object to that." Id. Upon considering whether Harrison's constitutional argument against forced medication was waived, we said:
We conclude that consideration of this issue is proper, not because of the "heightened scrutiny" or "death is different" argument, but because the issue in question presents a potential violation of constitutionally protected rights, recently addressed by the United States Supreme Court, and because it is unquestionably clear from the context as preserved in the record that the objection lodged by defense counsel was based on the rights safeguarded by the Fifth and Sixth Amendments and applicable to this case via the Fourteenth Amendment.
Id. at 903-04. Billiot made no objection at the competency hearing that the state violated his constitutional rights by administering anti-psychotic drugs to him prior to his competency evaluations. He argues, however, that this issue should not be waived because he expressly argued this point in his Proposed Findings of Fact and Conclusions of Law.
The fact is, Billiot never made an objection at all. He did argue in his proposed findings and conclusions that the state committed constitutional error here; however, the time to make that argument was before the state administered the medication, and if counsel could not have reasonably known of the prescribed anti-psychotic medication at that time, then the time to argue this issue was before the competency hearing. Furthermore, Harrison does not stand for the proposition that raising a constitutional claim, absent objection, in one's proposed findings of fact and conclusions of law is sufficient to avoid the procedural bar.
This assignment and the subheads flowing therefrom are procedurally barred.

V.

WHETHER CHEMICALLY INDUCING SANITY TO EXECUTE BILLIOT IS CRUEL AND UNUSUAL PUNISHMENT?
For the same reasons stated in the previous assignment, these issues were not properly raised before the trial court. The state is correct in arguing that this assignment of error is barred. Cole v. State, 525 So.2d 365, 369 (Miss. 1987).

VI.

WHETHER THE EXECUTION OF BILLIOT, WHO HAS BEEN REPEATEDLY DIAGNOSED AS A CHRONIC PARANOID SCHIZOPHRENIC, IS CRUEL AND UNUSUAL PUNISHMENT?
Billiot essentially asserts under this assignment of error that no one suffering from paranoid schizophrenia will ever be competent because their competency will always be in question. This assignment overlooks the fact that every expert that testified in this case stated that one could be a paranoid schizophrenic and still competent to be executed under our statute and the Ford v. Wainwright case. See also, Lowenfield v. Butler, 843 F.2d 183, 187 (5th Cir.1988), cert. denied, 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 714 (1988).
This assignment of error is without merit.

*18 VII.

WHETHER MISS. CODE ANN. § 99-19-57(2)(a) (Supp. 1992) CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT?
Citing Justice Robertson's concurring opinion in Billiot v. State, 478 So.2d 1043, 1048 (Miss. 1985), Billiot argues that Miss. Code Ann. § 99-19-57(2)(a) is unconstitutional. This statue does not allow for the execution of an insane person. The question raised by Billiot is whether the procedure outlined by the statute whereby an insane convict is committed and treated until being deemed sane, at which time he is given a new death date only to fall prey again to his mental illness  which is cyclical in nature and may never end, is violative of the Eighth Amendment?
The state takes the position that this case was remanded for the limited issue of determining whether or not Billiot is competent to be executed and therefore this issue is not properly before us on appeal. Culberson v. State, 456 So.2d 697 (Miss. 1984), is arguably applicable to this situation because this case was remanded for the limited reason of determining present sanity. We consider the issue barred.
We note however that the argument is fruitless in any event. Billiot argues that the process provided in the statute that calls for mental evaluation until the condemned is deemed sane enough to execute is unconstitutional. He argues that an insane person should have his death sentence commuted to a life sentence without parole. Neal v. State, 451 So.2d 743, 765 (Miss. 1984) (Hawkins, J., dissenting). The opinions rendered on this issue by Chief Justice Hawkins and Justice Robertson are extremely persuasive but the problem with this assignment of error is that Billiot was not determined to be insane for purposes of execution. Section 99-19-57(2)(a) is not invoked in this case. His constitutional argument is not applicable to his factual situation.
This assignment of error has no merit.
THE LOWER COURT'S JUDGMENT DENYING BILLIOT'S MOTION FOR POST-CONVICTION RELIEF ENTERED BY THE FIRST JUDICIAL DISTRICT OF HARRISON COUNTY IS AFFIRMED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and BANKS, McRAE, JAMES L. ROBERTS and SMITH, JJ., concur.
PITTMAN, J., not participating.